THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL HENDERSON, Defendant-Appellant.

First District (2nd Division)   No. 78-1821

Opinion filed April 15, 1980.

Thomas Peters, of Chicago (Murphy, Putnick, Peters & Davis, Ltd., of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant, Michael Henderson, was charged by information with the murder and rape of Zelder Wilson. Following a jury trial in the circuit court of Cook County, he was found guilty of murder, not guilty of rape, and was sentenced to 60 to 120 years imprisonment.

On appeal defendant contends that: (1) because of his limited intelligence and in the absence of family and legal counsel, he did not intelligently and voluntarily waive his right to remain silent; (2) the trial court erred in admitting his inculpatory statements because they were a product of an unlawful arrest; (3) the State failed to prove that he was fit to stand trial; (4) the trial court erred in admitting evidence of his blood type; (5) he was not proved guilty beyond a reasonable doubt; and (6) his sentence was excessive.

The record indicates that on September 15, 1976, the body of the 87-year-old victim was found lying nude from the waist down on the floor of her apartment. A pathologist testified that her cause of death was due to asphyxiation and blunt trauma to the head. After investigating the scene, the police arrested the 18-year-old defendant and took him to the station for questioning. After being advised of his rights, the defendant confessed to the murder and rape of the victim. According to the defendant's signed statement which was admitted into evidence and read at trial, the defendant said he returned to his apartment at about 11 a.m. that day and saw the victim in the back of the apartment building emptying garbage. He asked her for a glass of water and she invited him in. She told him to go ahead and get a glass of water. He did so, drank some, and put the glass on the sink. He then said he did not want any water, picked up a knife, told her he "wanted some pussy" and to go into the bedroom. She

consented and asked him not to kill her. He said after they had sex, they left the bedroom, he turned up the stereo, and they went into the kitchen. He told her she better not tell anyone, she said she wouldn't, and again asked him not to kill her. He then knocked her down, picked up a knife, and stabbed her four or five times. He said the knife he used was different from the one he originally picked up because the victim hid the other one. He left the knife he stabbed her with on the floor near her. He then went into the bathroom and washed his hands, leaving blood on the bathroom sink. He left the victim's apartment by the front door, went to his own apartment, took a shower, and changed his clothes. He said he threw his dirty clothes into his sister's laundry bag and she washed them. He said he cut his middle and ring fingers of his right hand when he stabbed the victim. When he left the victim's apartment, he had blood on his hand so he wiped it on the wall. He stated that he saw the man who lived in the third floor apartment, told him he saw a man running out of the victim's apartment, and asked him to see if the victim was okay. This man got another neighbor and after knocking on the victim's door, the defendant opened the door with his shirttail. He said they saw the victim lying on the floor.

## PRETRIAL HEARINGS

Prior to trial, the trial court held a competency hearing as well as a hearing on defendant's motions to quash his arrest on the grounds it was made without probable cause and to suppress his confession on the dual grounds that it was made subsequent to an illegal arrest and in violation of his constitutional rights. Defendant was found competent to stand trial, and the motions to quash the arrest and suppress the confession were denied.

At both these hearings, the defense called a psychiatrist and a psychologist to testify. Dr. Katz, whose qualifications as an expert in psychiatry were stipulated to by the State, testified that he examined the defendant on one occasion in June of 1977. In his opinion, the defendant was mentally retarded with a mental age of 12 to 14 years old. He said his opinion was corroborated by Chicago Board of Education reports on the defendant which indicated that in 1964, at a chronological age of 8 years old, defendant had an IQ of 77 and a mental age of 4 years 10 months; that in 1966, defendant had an IQ of 66; and that in 1970, defendant had an IQ of 74 and a mental age of 8.6 years old. Dr. Katz stated that a mentally retarded person has great difficulty in understanding concepts, numbers, and symbols, and has difficulty reading and understanding language. He stated that the defendant was capable of conversing on a simple level, and that although defendant made inconsistent statements, they were responsive to the questions asked. The inconsistency, he said, indicated an

attempt by defendant to disguise his retardation by saying things he thought the questioner wanted to hear. At the competency hearing, Dr. Katz testified that in his opinion, the defendant could understand the nature of the charges against him and the court proceedings, but would be unable to cooperate "fully to maximumly assist his Counsel." At the suppression hearing, Dr. Katz testified that the defendant would have a poor concept of the meaning of words such as "waive" and "consultation." After considering the fact that the defendant had been arrested on four prior occasions, Katz said defendant could understand the meaning of "lawyer" and "court of law." He said defendant would probably understand what was meant by a right to remain silent, that anything he said could be used against him, and the concept of being present with someone when informed that he had a right to have an attorney present. But defendant's ability to clearly understand and intelligently give up such rights, Katz said, would be diminished in a stressful situation. He also stated that the more experience the defendant had in a stressful situation, the less anxiety he would have.

Dr. Rosenwald, after his qualifications were reviewed, testified as an expert in psychology. He stated that in October of 1977, he administered the Weschler Adult Intelligence Scale and Bender Gestalt test to the defendant. He found that the defendant had an IQ of 62 which was equivalent to the mental age of 7 to 9 years old. He classified the defendant as a high grade mental defective which placed him in the bottom five percentile of the population. In Dr. Rosenwald's opinion, the defendant could understand the nature of the charges against him, but doubted whether he could understand the full nature of the criminal proceedings. He stated that defendant could comprehend the simplest kind of procedural questions, but would have great difficulty comprehending and answering complex questions. Dr. Rosenwald found the defendant to be cooperative and believed he would try to assist counsel in his defense, but was dubious as to how successful he would be. The degree of cooperation, he said, would be limited by defendant's IQ and impaired mental state. He stated that the defendant would understand the word "silent" but would not understand the full context of the words "right to remain silent" nor the implication of the phrase "advise of rights." Rosenwald said the defendant might respond affirmatively to questions in which such words were used because of his lack of understanding and the fact that he was cooperative. He said defendant would probably understand the words "lawyer" and "court of law" because he had been exposed to lawyers and courts over a period of time. In Rosenwald's opinion, the defendant would not understand the meaning of *Miranda* warnings even though he might say he did, and would have great difficulty in comprehending a waiver of his rights.

The State called Dr. Kaplan whose qualifications as an expert in psychiatry were stipulated to by the defense. He testified that he examined the defendant in August of 1977. Prior to this examination, he reviewed examinations of the defendant done by both a psychologist and psychiatrist concerning a prior matter and read the defendant's signed statement, police reports, and the results of a partial IQ test administered to the defendant by a court psychologist in 1976. He said this test indicated that defendant was of borderline intelligence. Borderline intelligence, Kaplan said, was equivalent to an IQ score of 70 to 90. Dr. Kaplan stated that an IQ score of 62, the score defendant attained on the intelligence tests administered by Rosenwald in 1977, indicated a high grade mental defective which meant mental retardation. He agreed that an IQ level of 62 would be equivalent to a mental age of 8 to 9 years old. At the competency hearing, Dr. Kaplan was of the opinion that defendant understood the charges against him, the nature of the court proceedings, and was capable of adequately cooperating with his attorney. That defendant was found to have an IQ of 62 did not change his opinion. At the suppression hearing, Dr. Kaplan stated that in his opinion, the defendant could understand the rights that were given to him and had the ability to waive them. Dr. Kaplan also stated that defendant's earlier experiences with arrests and court procedures enabled him to acquire knowledge and an understanding of what his rights were, thus enabling him to understand the warnings given in this case.

At the suppression hearing, in addition to the testimony of these expert witnesses, several other witnesses testified. The defendant, testifying in his own behalf, acknowledged that before he gave his statement he was informed of his rights both by the police and an assistant state's attorney and verbally waived them. However, he said, he really did not understand what these warnings meant. He said when the police picked him up he had cuts on two of his fingers. At first he said he had them when he left to play ball at 8 a.m. the day the incident occurred. Later he stated he got the cuts around noontime from playing ball. After further questioning, he said he got the cuts after sliding on some glass. He admitted being picked up by the police on prior occasions and being in court. He said he knew what the words "judge" and "court" meant but did not know what a lawyer was. Later he stated that when picked up on a prior matter he knew what a lawyer was and had talked to a public defender about the matter.

When asked about the statement he had given, he said he knew what a statement was and that he signed the statement but was told by the officer what letters to put down to sign his name. When asked how he spelled his name he misspelled both his first and last name. He said the attorney read the statement into a tape recorder while he listened and

then asked him if the statement was correct or accurate. He said he did not respond that the statement was correct and did not know what correct or accurate meant.

The defendant's sister testified that defendant had attended school through the 8th grade but could not read or write; that defendant could not write his name unless someone wrote it down for him to copy; and that her brother's attention span was limited but that they did carry on normal conversations.

Sergeant Glynn, the arresting officer testifying on behalf of the State, stated that he arrived at the scene of the crime at about 2 p.m. There he met the defendant who told him that at about 11 a.m. that day he saw a black male about 23 to 25 years old, 6'2" tall walk out of the victim's apartment and wipe blood on the hallway wall. The defendant told him he heard loud music playing. The officer then went into the victim's apartment and observed the victim's body. He also observed two knives with reddish-brown stains on them, one on the kitchen cabinet and the other in the front room. A member of the victim's family informed the officer that the defendant had broken into the victim's apartment a year ago. The officer then left the scene but returned a few hours later. Upon his return, he asked the defendant to re-enact exactly what he had observed. As the defendant did so, the officer noticed a band-aid on the defendant's middle right finger and inquired about it. He said the defendant responded that he had cut himself while making lunch and pulled back the band-aid. The officer observed a fresh cut which was still bleeding on defendant's middle finger and observed superficial cuts on defendant's ring finger. The officer said these cuts were consistent with blade wounds.

According to the officer, the defendant originally described the man he allegedly saw leaving the victim's apartment as wearing formal black leather shoes, having no mustache, and not wearing glasses. Later, the officer requestioned the defendant about this description. The officer admitted asking defendant leading questions such as what type of tennis shoes the man was wearing, what type of glasses he had on, horn-rimmed or straight, and what type of mustache he had. The officer said contrary to the original description, the defendant responded that the man was wearing plain white tennis shoes, horn-rimmed glasses, and had a Fu Man Chu mustache.

The officer testified that he placed defendant in the squad car, told him he was a suspect in the case, and informed him of his rights which defendant said he understood. Prior to questioning at the station, the officer said he read the defendant his rights which defendant said he understood. Defendant then consented to answer questions. After their conversation, the officer called in the assistant state's attorney. Sergeant Glynn verified the defendant's signature as it appeared on the recorded

statement and said he saw the defendant sign the statement without help from anyone. The officer also stated that he had been unaware that the defendant was of limited intelligence.

Ronald Guzman, an assistant state's attorney, testified that at about 6:25 p.m. on September 15, 1976, he met with the defendant and Sergeant Glynn. He told the defendant who he was, why he was there, and then in his own words advised the defendant of his rights. Guzman said after each right the defendant said he understood. Guzman further informed ·the defendant that he could stop talking at anytime. Defendant again said he understood. Guzman asked the defendant if he had already spoken to Sergeant Glynn and whether Glynn had informed him of his rights. Defendant responded affirmatively to both questions. Guzman then questioned the defendant about the incident. When this conversation terminated, Guzman asked the defendant if he wanted anything to eat or drink, if he wanted to make any phone calls, and whether he wanted treatment for the cut on his hand. Thereafter, Guzman contacted a court reporter, again advised the defendant of his rights, and a statement was taken and recorded. The typed statement was then given to the defendant to read, but defendant informed Guzman he could not read. Guzman then got a tape recorder in order to record his oral reading of the statement to the defendant. He said after he read each page, the defendant acknowledged that those were the questions asked and answers he gave. Defendant then initialled each page and signed the last page. Guzman stated that the defendant appeared normal, and he was never informed that defendant's intelligence was below normal.

### TRIAL EVIDENCE

The State's evidence indicated that at about 10:30 to 11 the morning of September 15, 1976, the 87-year-old victim was alive and in good health. Around 1:30 p.m., Willie Rogers, the victim's third floor neighbor, met the defendant exiting the apartment building. The defendant expressed concern to Rogers about the old lady residing on the first floor and told him of a man he had seen run out of the victim's apartment and wipe blood on the hallway wall. They entered the victim's apartment by the defendant opening the apartment door with his shirttail. They discovered the victim's body in the rear of the apartment. Rogers called the police. While they waited, defendant asked Rogers for a band-aid, stating he cut his finger while slicing lunchmeat. According to Rogers, defendant already had a band-aid on his finger.

Upon the arrival of the police, defendant talked to Sergeant Glynn whose testimony at trial was substantially the same as has already been set forth for the suppression hearing. In addition, Glynn related an account of what the defendant told him occurred on the day in question. This

account varied only in minor respects from the story the defendant subsequently related to the assistant state's attorney and which was then typed and signed by the defendant.

Assistant state's attorney Guzman testified as to statements made to him also set forth earlier in this opinion for the suppression hearing. In addition, Guzman testified that after advising the defendant of his rights, defendant told him that the victim asked him to have sex with her and after they did so, she grabbed a knife, tried to stab him, but tripped and fell on the knife stabbing herself. Guzman told the defendant he did not believe this story, and the defendant related another version of the events which was the same as that contained in the defendant's signed statement.

Other evidence offered by the State indicated that the victim had blood type O and defendant had blood type A; that blood type A was on the knife found in the front room and on the sample recovered from the hallway wall; that blood types A and O were on the knife found in the kitchen and on the victim's dress; that 43-45% of the population have blood type O and 40-43% have type A, and that no test can link a particular sample of blood to a particular person; and that tests for spermatozoa done on rectal and vaginal swabs taken from the victim were negative. The State stipulated to the fact that fingerprints taken from items in the apartment were compared with but did not match the defendant's prints.

The defense called Dr. Rosenwald whose testimony was substantially the same as his testimony at the suppression hearing.

The defendant's mother testified that defendant came home at 11 or 11:30 a.m. on the day in question, asked if he could fix something to eat, went into the kitchen, and when he came out he got a band-aid. She said she did not notice anything unusual about the defendant's clothing nor did she hear the washing machine or shower going at anytime that day.

In addition to the testimony she gave at the suppression hearing, the defendant's sister testified that on September 15, 1976, she left the family apartment at 6 a.m. when defendant was still in bed. She returned home at about 4 p.m. but did not see the defendant until about 11 or 12 that night at the police station. She said she did not see any dirty or bloody clothes of the defendant's and did not wash any clothes for him that day.

## I.

Defendant contends that the trial court erred in denying his motion to suppress the statement he signed. Defendant argues that because of his limited intelligence he was incapable of understanding the *Miranda* warnings in the form given to him and therefore did not intelligently and voluntarily waive his rights.

██ One suspected of a crime is guaranteed under the Constitution the rights of assistance of counsel and to remain silent during in-custody

police interrogation. Any statement obtained in derogation of those rights is inadmissible in a subsequent criminal prosecution. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) A suspect may waive his constitutional rights provided he does so voluntarily, knowingly, and intelligently. (*Miranda v. Arizona*; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.) The determination of whether there has been a knowing and intelligent waiver depends on the particular facts and circumstances of the case and includes the background, experience, and conduct of the accused. (*Johnson v. Zerbst*; *People v. Cooper* (1975), 30 Ill. App. 3d 326, 332, 332 N.E.2d 453, *cert. denied* (1976), 425 U.S. 994, 48 L. Ed. 2d 818, 96 S. Ct. 2206.) Although no single factor is determinative (*People v. Baker* (1973), 9 Ill. App. 3d 654, 659, 292 N.E.2d 760), the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary (*People v. Turner* (1973), 56 Ill. 2d 201, 206, 306 N.E.2d 27). However, subnormal mentality does not *ipso facto* make a confession involuntary so long as the subnormality has not deprived the defendant of the capacity to understand the meaning and effect of his confession. *People v. Hester* (1968), 39 Ill. 2d 489, 500, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.

■ In the present case, the record is clear that defendant was advised of his *Miranda* rights several times before making his statement. The issue here centers upon whether defendant knowingly and voluntarily waived those rights. Where, as here, this issue was raised on a motion to suppress, the State had the burden of showing by a preponderance of the evidence that the statement was made knowingly and voluntarily. (*People v. Baker*; *People v. Cooper*.) This court will not disturb the trial court's ruling on the motion to suppress unless it is found to be against the manifest weight of the evidence. *People v. Cooper*.

At the suppression hearing, Dr. Kaplan, a psychiatrist testifying for the State, said that based upon his examination of the defendant, the results of prior intelligence tests administered to the defendant, the defendant's confession, and the police reports, he believed the defendant was capable of understanding and of waiving his rights. Dr. Kaplan was of this opinion even after being informed that defendant had an IQ level of 62. Dr. Kaplan also testified that defendant's experiences in court, having been arrested on several prior occasions, would aid in his ability to understand his legal rights. Defendant's witness, Dr. Rosenwald, a psychologist, expressed his opinion that defendant would not understand the implications of his legal rights and would have great difficulty in comprehending a waiver of these rights. He did state, however, that prior experiences with the law could aid in defendant's understanding of certain words. Dr. Katz, a psychiatrist and defendant's other expert

witness, stated that defendant would have difficulty grasping abstract concepts but could possibly understand both his right to remain silent and that anything he said could be used against him, and also could understand the concept of being present with someone when informed he had a right to have an attorney present. Dr. Katz agreed that prior experiences with the law would make defendant more aware of words associated with courtroom experiences.

Defendant suggests that because defendant's incapacity resulted from mental retardation rather than from a mental disease, a psychologist was more qualified than a psychiatrist to render an opinion as to the defendant's capacity to understand his legal rights. The defendant submits that his evidence presented at the suppression hearing which included the testimony of a psychologist was more credible than the State's evidence which consisted of the testimony of a psychiatrist. While we consider this to be an interesting theory, it is an inappropriate one for us to consider in the present case. The issue defendant now raises was never brought to the attention of the trial court. Defendant has not furnished us an adequate basis on appeal to decide this question. The authorities defendant cites discuss the circumstances under which a psychologist might be found qualified to testify and render an opinion, but do not deal with the issue of whether the opinion of a psychologist is more credible than that of a psychiatrist on a particular matter. Defendant cites no authority for his statement that a psychiatrist is less qualified than a psychologist to evaluate a mentally retarded individual's capacity to understand his rights.

Defendant places much emphasis on the fact that his mental capacity caused him to be highly suggestible, and that he responded in a manner in which he thought his questioners wanted him to respond. Yet at the time defendant confessed, there is absolutely nothing in the record to support a finding that defendant was asked leading questions or that suggestions as to what occurred were made to him. (See *People v. Carpenter* (1976), 38 Ill. App. 3d 435, 441, 347 N.E.2d 781.) Defendant's confession was substantially corroborated by the physical evidence recovered from the scene of the crime. We do not find merit in defendant's argument that his confession was coerced. There is nothing in the record to substantiate such a finding.

■ Defendant relies on *People v. Baker* (1973), 9 Ill. App. 3d 654, 292 N.E.2d 760, wherein the trial court's finding that a 15-year-old defendant of limited intelligence did not intelligently or knowingly waive his *Miranda* rights, was upheld by this court on appeal. The sole issue on appeal was whether the trial court's ruling was against the manifest weight of the evidence. In *Baker*, 27 witnesses testified at the hearing on the motion to suppress, and this court in its decision placed great

emphasis on the fact that the judge observed these witnesses including the defendant while testifying and was in a better position to weigh the evidence. Similarly, in the present case, the trial court was in the best position to judge the demeanor and credibility of the witnesses and was afforded the opportunity to evaluate the defendant's ability to communicate and respond to questions when he testified in his own behalf. Based upon the evidence in this case we cannot say that the trial court's ruling was against the manifest weight of the evidence. Compare *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.

## II.

Defendant argues that his warrantless arrest was made without probable cause, and therefore the inculpatory statements he made after the warrantless arrest were the fruit of an illegal arrest and should have been suppressed. The parties agree that defendant was arrested at the time he was so informed by Sergeant Glynn and was taken to the police station. The question is whether probable cause for the warrantless arrest existed at that time. Defendant argues that at the time of the arrest the only evidence the arresting officer had was two exculpatory statements made by the defendant regarding the man he allegedly observed leaving the victim's apartment on the day in question.

■■ The evidence indicates that the two exculpatory statements to which defendant refers consisted of conflicting descriptions the defendant gave of the man he allegedly saw fleeing from the victim's apartment. Although defendant's second description of the alleged assailant was made in response to leading questions asked by the arresting officer, the officer did not at that time know or have reason to know of defendant's limited intelligence which might render him unduly susceptible to suggestive questions. Prior to the arrest, the arresting officer had viewed the scene of the crime and observed the victim and knives with blood on them. When the officer initially talked to the defendant, he observed fresh cuts on the defendant's hand which he said were consistent with blade wounds. In addition, a member of the victim's family informed the officer that defendant had broken into the victim's apartment a year earlier. The officer could consider this information because the usual requirement of prior reliability which must be met when police act upon tips from professional informers does not apply to information supplied by ordinary citizens. See *People v. Hester* (1968), 39 Ill. 2d 489, 514, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.

■■ ■ A police officer may arrest without a warrant when he has reasonable grounds to believe that the person is committing or has committed

an offense. (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) "Reasonable grounds" also referred to as "probable cause" exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Robinson* (1976), 62 Ill. 2d 273, 276, 342 N.E.2d 356; *People v. Ross* (1978), 60 Ill. App. 3d 857, 861, 377 N.E.2d 230.) Reasonable cause means something less than evidence which would result in a conviction and may be founded upon evidence that would not be admissible at trial. (*People v. Jones* (1964), 31 Ill. 2d 42, 47, 198 N.E.2d 821, *cert. denied* (1964), 379 U.S. 864, 13 L. Ed. 2d 67, 85 S. Ct. 129.) In *Jones*, our supreme court noted that the existence of reasonable cause depends upon the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Here, at the time of defendant's arrest, the arresting officer had sufficient grounds upon which to form a reasonable belief that defendant had committed the crime.

## III.

Defendant contends that the State failed to prove he was fit to stand trial.

■■ Fitness speaks only to a person's ability to function within the context of a trial and does not refer to sanity or competence in other areas; a defendant may be fit for trial although his mind may be otherwise unsound. (*People v. Murphy* (1978), 72 Ill. 2d 421, 432-33, 381 N.E.2d 677.) The test for determining whether a defendant is fit to stand trial is whether he is able to understand the nature and purpose of the proceedings and is able to assist in his own defense. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1(a); *People v. Murphy*, at 431.) The State bears the ultimate burden of establishing the defendant's fitness by a preponderance of the evidence. *People v. Bilyew* (1978), 73 Ill. 2d 294, 300, 383 N.E.2d 212.

At the fitness hearing, the State's witness, Dr. Kaplan, a psychiatrist, was of the opinion that defendant could understand the nature of the charges against him, the nature of the proceedings, and would be able to cooperate with his attorney. Defense witnesses, Dr. Katz, a psychiatrist, and Dr. Rosenwald, a psychologist, agreed that defendant could understand the nature of the charges against him. Katz believed that defendant could understand the court proceedings, but Rosenwald doubted whether the defendant would understand the full nature of the proceedings. As to defendant's ability to assist his attorney, Katz was of the opinion that defendant would be unable to cooperate fully to "maximumly" assist his counsel. Katz did state that defendant's answers, although

sometime inconsistent, were responsive to questions asked, and that he was able to carry on a conversation at a simple level.

■■ ■ To be found fit, defendant must be able to cooperate with his attorney to the extent that his defense may be conducted in a rational manner. (*People v. Rosochacki* (1969), 41 Ill. 2d 483, 490, 244 N.E.2d 136.) In order to conduct a defense in a rational and reasonable manner, a defendant should be capable of cooperating with his counsel to the end that any available defenses may be interposed. (*People v. Burson* (1957), 11 Ill. 2d 360, 369, 143 N.E.2d 239.) The testimony presented by the defense witnesses does not negate this possibility. The unequivocal testimony of Dr. Kaplan supports the trial court's finding of fitness.

IV.

Defendant argues that the trial court erred in admitting evidence of his blood type.

■ At trial, evidence was introduced that the defendant had type A blood, that the victim had type O blood, and that blood types A and O were found at the scene of the crime. Further evidence indicated that 43-45% of the population have type O blood and that 40-43% have type A blood, and that a particular sample of blood cannot be linked to a particular person. Defendant argues that the fact that he has type A blood had little or no probative value in view of the large proportion of the general population having blood of that type, and its admission into evidence was prejudicial to him. Defendant, relying on cases from other jurisdictions (*People v. Robinson* (1970), 27 N.Y.2d 864, 317 N.Y.S.2d 19; *People v. Macedonio* (1977), 42 N.Y.2d 944, 397 N.Y.S.2d 1002; *State v. Peterson* (1974), ___ Iowa ___, 219 N.W.2d 665), argues that this court should adopt a rule excluding evidence of similar blood types as is presently done in paternity proceedings in Illinois. In paternity proceedings, evidence of the alleged father's blood type is admissible only if it excludes him as being the father of the child. Ill. Rev. Stat. 1977, ch. 40, pars. 1401 and 1404.

In rejecting the argument that such an exclusionary rule as applied in paternity actions be applied in criminal actions, this court in *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 573, 321 N.E.2d 398, stated:

> "The reasons the legislature enacted the exclusionary rule in paternity cases may be based on social policies which override the scientific reliability of the evidence. Suffice it to say that the legislature did not extend the exclusionary rule to criminal cases. The court finds no other expression of public policy, by statute or otherwise, to exclude the results of properly performed blood grouping tests based upon the ABO system of classifying blood types."

And this court in *People v. Johnson* (1976), 37 Ill. App. 3d 328, 332,

345 N.E.2d 531, specifically declined to accept the New York rule that blood typings are not admissible for identification purposes, stating:

"This court and others have recognized heretofore that evidence of * * * blood * * * found at the scene of the crime may be admitted, with appropriate foundation, even though its probative value may not be considerable."

The defendant's argument does not persuade us to depart from the established rule in Illinois.

Furthermore, the New York court in *People v. Robinson*, a case relied upon by defendant, found the admission of defendant's blood type of no probative value, but held that the admission of such evidence was not prejudicial in view of the adequacy of the case and the instructions given. The other cases relied upon by the defendant cite *Robinson*. Here, the admission of defendant's blood type was only one link in the chain of evidence presented by the State.

## V.

Defendant contends that he was not proved guilty beyond a reasonable doubt. Defendant argues that the inconsistencies between his inculpatory statements and the physical evidence recovered from the scene of the crime created a reasonable doubt as to his guilt.

Defendant first argues that because tests taken from the victim were negative for spermatozoa and the fact that the pathologist testified there were no signs of tearing or lacerations of the victim's vaginal or rectal area, defendant's statement that he had had intercourse with the victim was not true and indicates that he confessed to something he did not do. However, such evidence does not conclusively prove intercourse did not take place. As the microanalyst testified, spermatozoa would not be present if the male did not have an emission during intercourse.

Defendant argues that his statement that he killed the victim by stabbing her with a knife is inconsistent with the pathologist's finding that the cause of death was due to asphyxiation and blunt trauma to the head. The pathologist testified that several of the wounds on the victim's body could have been caused by the blunt end of a knife. The pathologist also testified that he observed lacerations on the victim's head and a stab wound in her right femur area. Two knives were found with the victim's blood type on them. Considering this evidence, the defendant's statement could be viewed as consistent with the wounds found on the victim's body.

Defendant argues that his fingerprints were not found on things he said he had touched. The absence of defendant's fingerprints on these items does not necessarily prove his innocence. It is interesting to note that when defendant went to the victim's apartment with his neighbor just

prior to the arrival of the police, defendant used his shirttail to open the door. To be considered here are the many consistencies which did exist between the defendant's confession and the physical evidence.

Defendant stated that he went to the victim's apartment and asked for a glass of water, and after the victim gave him the water he said he did not want it; a glass of water was observed on the kitchen sink by an investigating officer. The defendant said that after he raped the victim and stabbed her several times, he went into the bathroom to wash his hands; blood was found in the bathroom sink. Defendant stated that he cut his hand and rubbed it along the hallway wall; the investigating officers noticed cuts on the defendant's fingers and blood of the same type as the defendant's was found on the hallway wall. Defendant talked of using two knives in the attack; two knives were found, one with blood on it matching that of defendant's blood type. Defendant said he turned up the stereo to hide his attack; one of the first witnesses at the scene said the stereo was playing loudly. Defendant repeated these same inculpatory statements three different times, first to Sergeant Glynn, then to assistant state's attorney Guzman, and then to both of these men in the presence of a court reporter. Any discrepancies which may have existed between the defendant's confession and the physical evidence were for the jury to consider in assessing the degree of credibility to accord the confession. *People v. Hester* (1968), 39 Ill. 2d 489, 511, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.

Defendant argues that he made inculpatory statements only after the officer and assistant state's attorney told him they did not believe his first story in which he claimed the victim's death was an accident. Defendant maintains that because of his mental state he was so prone to suggestiveness that he confessed to the murder because he thought that was what the officer and attorney wanted to hear. Yet there is absolutely no evidence in the record to indicate that defendant's confession was coerced or resulted from suggestions made by the officer or attorney, or that defendant knew of the physical evidence which had been recovered prior to the time he confessed. The evidence in this case is not so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's guilt. *People v. Mills* (1968), 40 Ill. 2d 4, 19, 237 N.E.2d 697.

## VI.

Lastly, defendant contends that his sentence of 60 to 120 years imprisonment is excessive and should be reduced to 14 to 25 years or less. Defendant argues that a sentencing judge must take into consideration the potential for restoration to useful citizenship as well as the nature of the crime; that the potential for restoration becomes more important when a

youthful offender such as the defendant is involved; that defendant had no prior felony record; and that the mitigating factor of defendant's mental retardation was present.

■■ Although Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)) allows a reviewing court to reduce punishments, the imposition of a sentence by the trial court is a matter of judicial discretion, and, absent an abuse of that discretion, the sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The Illinois Constitution provides that all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11.) However, the objective of restoration to useful citizenship does not outweigh the other factors the sentencing judge takes into consideration. Based upon the record in this case, we cannot say that the sentencing judge abused his discretion.

Based upon the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and HARTMAN, JJ., concur.