THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GREGORY BUSH, Defendant-Appellant.

Fifth District    No. 80-70

Opinion filed November 19, 1981.—Rehearing denied January 5, 1982.

John H. Reid, Charles M. Leonhard, and E. William Hutton, all of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, Gregory Bush, was convicted of the murders of Zelma Durbin and her son, Craig Durbin, following a jury trial in the Circuit Court of St. Clair County. The jury did not return a sentence imposing the death penalty, and the court sentenced defendant to consecutive terms of natural life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), finding that the murders were accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty."

The following issues are raised on appeal: whether the trial court erred in informing prospective jurors that the State would be seeking the death penalty and asking them how this would affect their deliberations; whether defendant was denied a fair trial by the admission of expert testimony regarding blood type; whether the trial court erred in admitting certain rebuttal testimony regarding defendant's prior use of knives; whether the trial court erred in allowing the prosecutor, in his closing argument, to conduct a physical demonstration re-creating the crime scene wherein he attempted to show that defendant could not have moved one of the victims' bodies in the manner testified to; whether the consecutive life sentences were excessive; whether the natural life sentencing provision is unconstitutional; and whether the evidence was sufficient to sustain the conviction.

On May 30, 1979, at approximately 7 a.m., the Cahokia Police Department received a call from Ethyl Beardsley, Ms. Durbin's sister-in-law. Ms. Beardsley would usually babysit for Craig after Ms. Durbin dropped him off at 6. Ms. Durbin was late this morning. Ms. Beardsley had called the Durbin residence several times and received no answer at first and then a busy signal. She then proceeded to the Durbin residence but found the house locked. At this time she went to a nearby residence and called the police.

Community Service Aid Jeffrey Goodrich was the first to arrive and Cahokia Police Sergeant Robert Staten arrived shortly thereafter. Officer Staten broke into the house and found the victims' bodies, Ms. Durbin in the kitchen and Craig in one of the bedrooms. The officer then began searching the premises. During Goodrich's investigation the defendant, who lived next door to the Durbins, called out through his window and asked if the Durbins had been "ripped off." Detective Henry Evans was the next officer to arrive at the scene. When defendant spoke to Detective Evans through his window, Evans asked defendant to come outside. Defendant came out wearing blue jeans, shoes and glasses. Detective Evans noticed a red substance on defendant's stomach and the underside of his arms which appeared to be blood. Defendant stated that the blood came from a fight he had with his girl friend, Annette Noe. Evans went to

talk with Ms. Noe and upon returning placed defendant under arrest, read him his *Miranda* rights, and had defendant sign a waiver of those rights. Defendant testified that the statement concerning the fight with his girl friend was false.

Crime technician Alva Busch obtained samples of blood from defendant's hands, arms and stomach, took photographs of defendant and collected his clothes and glasses. The glasses were taken since they were also bespeckled with blood.

Throughout this period, defendant repeated the phrase, "I didn't rip them off." Defendant testified that he in fact stated that, "I didn't take anything out of the house."

Alva Busch and Henry Edens, crime technicians, processed the scene. The following items were found in the kitchen area of the Durbin residence. Two telephones were found with the cords cut and smeared with a red substance, later determined to be blood. Hair, without roots, in considerable amounts was found on the floor near Ms. Durbin's body. Two rugs in the kitchen were soaked with blood. A large wood fragment was found on the floor with other wood fragments a few feet away. The larger items in the kitchen, the appliances, a wooden stool and the counter all had varying amounts of blood on them. The contents of a woman's purse were on the counter. Ms. Durbin was found wearing a bra, a blouse, an earring in her left ear and three quarter length hosiery. Busch and Edens then proceeded to the bedroom where Craig's body was found. Craig was found lying on the bed wearing a T-shirt. Underpants were on the floor to the left of the bed. The area of the bed surrounding his body was soaked with blood as was the wall above the bed. A knife with a serrated blade was found in the room. There was no handle on the knife and the blade was covered with blood.

Blood samples were taken from the crime scene with samples of the two victims, and the defendant taken for purposes of comparison.

Defendant was taken into custody at the Cahokia police station where he was interrogated by Detective Sergeant Robert Baldwin and Detective Charles Sharp. Defendant stated that earlier that evening he had been with his girl friend, Annette Noe, and had taken her home at approximately 3 a.m. Then he returned to his house with a friend, Donna Darnell, and stayed there until approximately 6:45 a.m., at which time he took her home. Defendant stated that after he took Ms. Darnell home that he became involved in an incident with some black people at which time he engaged in a fight and cut his hand on some glass on the ground. During the interrogation, the officers took the defendant to have his hand treated by a physician. Defendant then stated that he had not cut his hand on glass but rather his hand had been cut by a knife when the black man attacked him. Defendant stated that he threw up his hands while preparing

to do a karate kick and that the black man cut him. Defendant further stated that he dragged the black man, by his hair, down by the river and threw him in. Defendant then took the officers to the location of the alleged incident. The officers found no tire tracks or other indication that such an incident took place. At this point defendant stated that "[i]t didn't happen the way I told you."

Defendant then stated that he arrived home at approximately 6:30 a.m., went into his bedroom, opened a window and lay down. A few minutes later defendant observed Ms. Durbin getting into her station wagon. He went outside for the purpose of talking to her. When he got outside he observed her walking around the front of her house. Defendant followed, lost sight of her for a short time, and eventually went around to the front of the house. Defendant opened the door and found Ms. Durbin lying face down with blood surrounding her. Defendant stated that he turned her over, noting "that she was butchered like a hog."

The officers then proceeded to defendant's house after obtaining a consent to search form which defendant signed. When they reached the house they entered defendant's bedroom and defendant retrieved prescription bottles, with Ms. Durbin's name on them, from under his bed. Officer Baldwin reached under the bed and pulled out a blood-stained jacket. Also found was a gold medallion and chain, later identified to be Ms. Durbin's. At this point defendant admitted taking the prescription bottles and the medallion and chain from Ms. Durbin's house. A pair of cut-off blue jeans with wood fragments in the rear pocket was also recovered from defendant's bedroom.

Crime technician Edens conducted a search of defendant's back yard while the search of defendant's bedroom was taking place. Edens found a green wastecan outside defendant's window which contained a white washrag covered with blood. Also found was a butcher knife which was underneath a board directly below the wastecan.

At trial, defendant testified that he was with Ms. Noe until approximately 1:30 a.m. and with Ms. Darnell until approximately 5:45 a.m. He stated that when he returned home he saw Ms. Durbin in her driveway and spoke with her. Defendant testified that he then went into his house and "dozed off." A short time later defendant heard a noise but thought it was coming from his stereo. He looked out his bedroom window and saw Ms. Durbin's car still in the driveway. Thinking this to be unusual, he put on a pair of cut-off jeans and a jacket and walked toward the Durbin residence. He heard another noise and began running toward the fence which separated his back yard from the Durbins'. Defendant further testified that while jumping over the fence, a piece of clothing became entangled and he fell. Defendant believed it was at this point that he cut his hand. Defendant got up and proceeded to the back door of the

Durbins. Finding it ajar, he pushed it open and entered the kitchen. There he found Ms. Durbin's body lying face down. He turned her over, although he found it difficult because the blood surrounding the body made the floor quite slippery. Defendant testified that he was "shaky" and "freaked out" by what he saw. Defendant then took two prescription bottles from the kitchen table and heard a "thump and slide," became frightened, ran out of the door, jumped over the fence and returned home. Defendant placed the two pill bottles and a medallion, which he did not recall taking, under his bed. Defendant also testified that he considered calling the police but realized that he had taken items from the Durbin residence. Shortly thereafter defendant fell asleep.

Defendant stated that the police made a number of errors in the police report in recording what he had told them after abandoning his story concerning the alleged incident with the black men. Basically, defendant refuted the testimony of the interrogating officers as to what he told them at the time. Defendant's testimony at trial, as stated above, renders a different account of the occurrence in question.

Forensic scientist Jackie Fracaro identified People's exhibits Nos. 1, 2 and 3 as matching the inked footprint of defendant's left foot. The exhibits were latent footprints lifted from the area surrounding Ms. Durbin's body taken by crime technician Alva Busch on May 30, 1979. Mr. Fracaro was able to make a positive identification that the latent prints taken at the crime scene matched the inked print of the defendant.

Forensic scientists Retha Mathews and Mark Stolorow gave testimony concerning the blood samples taken from the Durbin residence, defendant's residence, and the green wastecan. A chemical test was used to determine if the samples were blood and an immunological test was employed to determine if it was human blood and, if so, of what type. The blood samples were typed according to the ABO grouping system and, in some instances, the esterase D (EsD) system was used. These tests are used to determine whether the blood type is consistent with that of a particular person, and the witnesses testified that certain types are present in the population with certain frequencies.

Ms. Mathews tested the blood of defendant, Ms. Durbin and Craig and found the following results:

Defendant—ABO type A, EsD type 2-1;
Ms. Durbin—ABO type O, EsD type 1;
Craig Durbin—ABO type O, EsD type 2-1.

Many blood samples were taken from items in the Durbin residence. Some of the results of those tests are as follow:

Receiver on red telephone—ABO A, EsD 2-1
Receiver on yellow telephone—ABO A
Kitchen floor—ABO O, EsD 1

Inside doorknob of rear door—ABO A
Wooden stool—ABO O, EsD 1
Kitchen sink—ABO O, EsD 1.

Blood samples taken from defendant's person revealed ABO-O blood which would be consistent with either Ms. Durbin or Craig. The contents of the green wastecan found outside defendant's house revealed both ABO-A and ABO-O type blood.

Mr. Stolorow testified as to the population frequencies of certain blood types. He stated that the population frequency for ABO-A, EsD 2-1 is eight percent, and that for ABO-O, EsD 2-1 is between nine and 10 percent.

Defendant objected to the giving of the testimony concerning the blood sampling for lack of foundation. Defendant argued that Ms. Mathews' opinion was not premised on an adequate factual basis because she could not make a positive identification as to whose blood was present in the sample. Defendant also moved to strike the testimony because of Ms. Mathews' failure to enumerate the exact tests used.

Dr. Jeffrey Fisher, a pathologist, performed the autopsies on the victims. Dr. Fisher testified that the cause of death of both victims was bilateral hemothorax and exsanguination due to multiple stab wounds. Describing the body of Craig Durbin, Dr. Fisher testified that there were 27 stab wounds, four of which were to his back and penetrated the chest. People's exhibit No. 4 was a photograph of Craig taken at the crime scene which shows that he was eviscerated. Dr. Fisher testified that Ms. Durbin had 60 stab wounds and that her heart and liver were lacerated. The record reveals that Ms. Durbin's teeth and hair were found under the kitchen rug.

Defendant asserts that the trial court erred in informing prospective jurors that the State would be seeking the death penalty and by asking them how this would affect their deliberations. After informing the entire venire that the State would be seeking the death penalty, the prosecutor asked whether the possible imposition of the sentence would prevent them from ruling impartially on the question of guilt or innocence of the accused. Defendant contends that such questions on voir dire and subsequent removals by the court for cause as a result of the answers given are inconsistent with the holdings of the United States Supreme Court in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, and *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521.

*Witherspoon* and its progeny "establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions

and his oath." (*Adams*, 448 U.S. 38, 45, 65 L. Ed. 581, 589, 100 S. Ct. 2521, 2526.) In *Adams*, the trial court excluded a number of prospective jurors who were unwilling or unable to take an oath, pursuant to a Texas statute, that the mandatory penalty of death or life imprisonment would not affect their deliberations on any issues of fact. The Supreme Court held that the Texas statute was applied in that case to exclude prospective jurors on grounds impermissible under *Witherspoon* and related cases.

The alleged error in the instant case involved the first panel of four jurors questioned during voir dire. It should be noted that, upon motion of defendant, separate juries were to be empaneled for determination of guilt or innocence and for sentencing; although after conviction, at the request of the defendant, the panel that determined his guilt also determined his sentence. The court asked the prospective jurors whether they would be able to give the defendant a fair and impartial trial knowing that death was a possible punishment, although noting that they would not be required to determine defendant's sentence. The entire panel responded affirmatively. No objection was made to this line of questioning at trial or in post-trial motion. The court then asked the jurors whether they had prior knowledge of the case and whether they had formed an opinion as to the guilt or innocence of the defendant. Two of the panel members responded that they had become aware of the case through the media and that they had formed an opinion as to guilt or innocence. One of the two jurors also expressed doubts as to the effect of the possible imposition of the death penalty on her deliberations. Both of these jurors were excused by the court for cause without challenge and without objection of counsel, who were asked if they had any objection to the court excusing the two jurors.

The State responds that *Witherspoon* and *Adams* are inapplicable to the instant case. We agree. In the first place, defendant was not sentenced to death, and defendant acknowledges the inapplicability of the holding of *Witherspoon*. Both of the jurors excused from this panel stated that they had formed an opinion as to defendant's guilt or innocence. Although one of them also expressed doubts as to the effect of the possible imposition of the death penalty on her deliberations, the fact that she had formed an opinion is sufficient reason for her excusal. In fact, it would appear that the defendant approved of the jury selection procedure employed by the court and perceived it to be a procedure devised for his protection.

■■ Defendant next asserts that he was denied a fair trial by the admission of expert testimony regarding blood type. Evidence was introduced at trial that defendant had ABO-A type blood and the victims had ABO-O type. ABO-A blood was found on items at the crime scene. Testimony as to population frequencies of the blood types was also given. Defendant

argues that such evidence has little, if any, probative value and that as a result of the "deceptive authoritativeness" of the testimony that the minimal probative value is substantially outweighed by the prejudicial effect of such testimony.

Defendant relies on the so-called New York rule which states that such evidence is inadmissible because it lacks probative value in that a large proportion of the population will have the same blood type. (*People v. Robinson* (1970), 265 N.Y.2d 543, 27 N.E.2d 864.) However, the Illinois courts have specifically rejected this argument and have taken judicial notice of the scientific reliability of the ABO system of blood grouping, while recognizing that such evidence does not have great probative value, if predicated on sufficient foundation in conducting the tests. *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398.

Defendant further argues that the former Illinois rule in paternity proceedings should be applied to the instant case. In paternity proceedings, evidence of the putative father's blood type was admissible only if it conclusively excluded him as being the father of the child. (Ill. Rev. Stat. 1979, ch. 40, pars. 1401 and 1404, amended by Pub. Act 81-1445, effective January 1, 1981.) This argument was rejected in *People v. Henderson* (1980), 83 Ill. App. 3d 854, 404 N.E.2d 392. We find no compelling reasons to depart from the established precedent in Illinois. Thus, the expert testimony regarding the blood found on items at the scene of the crime, blood on defendant shortly after commission of the crime, and the blood types of the victims and the defendant was properly admitted.

■■ Defendant also asserts that this evidence was inadmissible for failure to lay a proper foundation, although the specific nature of this argument is not clear. In *Gillespie*, the court held that while evidence of blood grouping is generally admissible, there must be a proper foundation laid for admission. However, the court was not explicit as to what is required for such foundation. In the instant appeal, the defendant is apparently challenging the sufficiency of the tests used for determining blood type. The primary testimony regarding the blood analysis was given by Retha Mathews, a forensic scientist with the Illinois Department of Law Enforcement, Bureau of Scientific Services. Ms. Mathews, a graduate of Southeast Missouri State University with degrees in zoology and biology, testified that she had been with the Bureau of Scientific Services for eight months, specialized in serology, had submitted papers on that subject to the American Association of Forensic Scientists, and that she was supervised while performing the tests relevant to this case. Ms. Mathews further testified that she performed a chemical test of each item submitted to determine if the substance was blood, an immunological test to determine the blood type under the ABO system, and a biochemical test to determine the blood type under the esterase D (EsD) system. Consider-

ing the qualifications of the expert, the fact that she was supervised by senior personnel, and the description of the tests used, we find that proper foundation was laid for the admission of the evidence.

Defendant asserts that the trial court erred in admitting certain rebuttal testimony regarding defendant's prior use of knives. Defendant argues that this evidence did not rebut anything in his testimony and, further, that it constituted evidence of other crimes.

On cross-examination, the following exchange took place between the prosecutor and the defendant:

"Q. You never carried a knife in that sheath?
A. No sir, I don't own a knife. I don't like knives.
Q. You don't like knives?
A. No.
Q. Have you ever indicated to anybody else that you did?
A. No sir.
Q. Ever?
A. No sir."

Rebuttal evidence was introduced as to defendant's activities at a party approximately four months prior to the commission of the crime. The two rebuttal witnesses testified that defendant displayed a butcher knife at a party they were attending. The testimony indicates that defendant had no intention of actually using the knife. In its order following the post-trial motions, the court stated that rebuttal testimony was properly admitted to rebut defendant's volunteered statement.

Rebuttal evidence is that which is adduced by the prosecutor to explain, repel, contradict, or disprove evidence given by the defendant. (*People v. Carbona* (1975), 27 Ill. App. 3d 988, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114.) A rebuttal witness may be called to contradict the defendant's testimony as to a material issue, but not as to collateral or immaterial matter. (*People v. McGhee* (1974), 20 Ill. App. 3d 915, 314 N.E.2d 313.) In the instant case, the rebuttal testimony contradicts defendant's statement on cross-examination as to his dislike for knives. Further, the rebuttal testimony is patently relevant to the question of defendant's believability and veracity. (See *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) Therefore, the trial court was correct in admitting the testimony to rebut defendant's volunteered statement.

Defendant asserts that the trial court erred in allowing the State to conduct a physical demonstration during closing argument in that the demonstration in essence allowed the prosecutor to testify or offer evidence on behalf of the State. During cross-examination of defendant, the prosecutor had defendant position an assistant state's attorney during a physical demonstration, to re-create the scene at which defendant

allegedly found one of the victims. The defendant then demonstrated the manner in which he had turned over the body. During the State's closing argument, the prosecutor conducted a physical demonstration using the same model to show the position of this victim's body. This demonstration was based on a photographic exhibit introduced at trial and was apparently intended to demonstrate the defendant could not have turned over Ms. Durbin's body as he had testified he had done. Over defendant's objection, apparently because of the location of furniture in the courtroom, the trial court allowed the prosecutor to conduct the demonstration. In its order denying defendant a new trial, the court stated that the demonstration in closing argument was proper where it was based on a photograph admitted into evidence. It is impossible to determine from the record precisely what occurred during the demonstration or the thrust of defendant's objection.

■■■ Admission of demonstrative evidence is a matter within the discretion of the trial court. (*People v. Proper* (1979), 68 Ill. App. 3d 250, 385 N.E.2d 882.) In the instant case we find no abuse of that discretion because both demonstrations were based on evidence admitted at trial. The first demonstration was based on defendant's testimony and the second on a photographic exhibit.

Defendant next asserts that the consecutive life sentences imposed are excessive in that defendant is 19 years old, has no prior felony record, and has a history of employment. The trial court sentenced the defendant to consecutive terms of natural life imprisonment pursuant to section 5—8—1(a)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)), finding that the murders were accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." There can be no challenge to a single sentence of natural life imprisonment in this case because the sentence is mandated by section 5—8—1(a)(1), (c) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1), (c)) for the murder of more than one victim.

■■ ■ A trial court may impose consecutive sentences, subject to the limitations in section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4), where

> " * * * having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such is necessary to protect the public from further criminal conduct by the defendant and where the offenses were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." (*People v. Craig* (1977), 47 Ill. App. 3d 242, 253-54, 361 N.E.2d 736, 745.)

Imposition of sentence is a matter within the discretion of the trial court.

(*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The record reveals that while the court placed emphasis on the nature of the offense and the protection of society, it did consider the requisite factors in imposing the consecutive life sentences. After careful review of the record, we find no abuse of discretion in the imposition of sentence. Defendant further argues that the murders were part of a single course of conduct and, as such, consecutive sentences cannot be imposed. We find that two murders constitute separate and distinct acts even though they were proximate in time and space. See *Craig; People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838; *People v. Davis* (1974), 20 Ill. App. 3d 948, 314 N.E.2d 723.

Defendant asserts that the natural life sentencing provision (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) is unconstitutional in that it is violative of article I, section 11 of the Illinois Constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

■■ Defendant argues that article I, section 11, requires an express finding by the trial court that there is no possibility of restoring the defendant to useful citizenship. This argument was rejected in *People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330, and in *People v. Bartik* (1981), 94 Ill. App. 3d 696, 418 N.E.2d 1108, where the court held that the constitution did not so mandate. The court stated that the "record must show that the trial judge considered both the seriousness of the crime and the defendant's rehabilitative potential." (94 Ill. App. 3d 696, 702, 418 N.E.2d 1108, 1113.) In the instant case the record reveals that the trial judge considered these factors. This court also rejected this argument in *People v. Merchel* (1980), 91 Ill. App. 3d 285, 414 N.E.2d 804. We find no reason to depart from our previous holdings.

Defendant's final contention is that he was not proved guilty beyond a reasonable doubt. Defendant argues that the evidence showed only his presence at the scene of the offense and that his exculpatory testimony was corroborated in many respects by other evidence produced at trial. The State responds that defendant's guilt was circumstantially established by, *inter alia*, blood on defendant shortly after the offense, defendant's admission of being in the house, and the presence of items in defendant's room which were taken from the victim's home.

■■ Defendant argues that the evidence was entirely circumstantial and insufficient to disprove, in any significant manner, defendant's trial testimony. A conviction may be sustained on circumstantial evidence, it being only necessary that the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the

accused and no one else committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.) While a conviction may be sustained on circumstantial evidence, the guilt of the accused must be established as to exclude any reasonable hypothesis of innocence. (*People v. Lewellen* (1969) 43 Ill. 2d 74, 250 N.E.2d 651.) In the instant case defendant made several statements to officers that he later admitted to be untrue. Defendant made another statement to the officers as to how he discovered the bodies of the victims. This statement was inconsistent with his exculpatory testimony at trial. It is the responsibility of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. (*People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 402 N.E.2d 915.) A jury is not compelled to accept a defendant's account of what happened but can consider the surrounding circumstances and the probability or improbability of the defendant's story. (*People v. Camden* (1980), 91 Ill. App. 3d 946, 414 N.E.2d 823.) The State introduced evidence to indicate substantially more than mere presence at the scene of the offense. Defendant relies primarily on his own exculpatory testimony which was inconsistent with testimony previously given. All of the testimony was heard by the jury. After careful review of the record, we find sufficient evidence, albeit circumstantial, to support the jury's verdict of guilty. Defendant offers no compelling argument upon which to disturb that verdict.

For the foregoing reasons, the judgment of the Circuit Court of St. Clair County is affirmed.

Affirmed.

KASSERMAN, P. J., and JONES, J., concur.