617 So.2d 642 (1993)
Dwight COVERSON,
v.
STATE of Mississippi.
No. 90-KA-1170.
Supreme Court of Mississippi.
Decided April 15, 1993.
George S. Luter, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Ellen Y. Dale, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and PITTMAN and SMITH, JJ.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
In this burglary and attempted sexual-assault case, the defendant, Dwight Coverson, broke into Curtescine Lloyd's home in Edwards, Mississippi, on the night of February 3, 1990. Coverson burglarized Lloyd's home and then attempted  but failed  to sexually assault her. A subsequent investigation by the Hinds County Sheriff's Department led to Coverson's arrest. *643 A jury in the Hinds County Circuit Court found Coverson guilty, for which the trial judge sentenced him to a total of 25 years' imprisonment.

A. Detailed Facts[1]
The victim in this case provided a factual account of the events:
Okay, I heard this noise [around midnight on February 3]. It didn't seem to be a loud noise. I'm a real light sleeper, so I woke up. I didn't think anything about it because my aunt lived with me and I thought maybe she had got sick during the night because she does get sick sometimes. So I turned over in bed. I always leave a night light burning in my bathroom. My bathroom is exactly across the hall from my bedroom. And I turned over in bed so I could be facing the door so when she walks up, you know, to tell me she was sick I'd see her.
I heard another noise, and this noise was closer to my bedroom, as if someone had walked into a chair. And I just laid there waiting for her to come. While I was watching, here appeared this man standing in my bedroom door, with a cap turned backwards on his head and both fists balled up and his shoulders slumped over like that. And I laid there and I squinched my eyes to make sure I was awake, and he was standing there trying to focus on me.
I sat straight up in bed, and I said, "Oh, my God! Oh, my God!" And he ran over to the bed as fast as he could and shoved me with his hand open in my chest, and shoved me back in bed. He said, "Bitch, you'd better not turn on a light." I had a night-lamp on my nightstand... . He said, "Bitch, you'd better not turn on a light." I said, "Okay, okay, please, don't kill me; don't kill me. What do you want? Please, don't kill me." And I was pleading with him. He stood there for a minute, right close beside my bed. He said, "Bitch, if you holler, you're dead. You'd better not breathe loud." And I was saying, "Okay, okay, please, don't kill me. What do you want? Please don't kill me."
He says, "Wait a minute." He said, "First, I'm gonna get me some of this. I don't know, I might kill you." He said, "But first I'm gonna get me some of this." And I said "Oh, my God!" He said, "Bitch, what did you say?" I said, "Nothing, nothing." And he said, "Okay, I'm going to take my clothes off." He said, "You listen. I'm going to take my clothes off." He says, "And if you breathe loud, bitch, you're dead." I said, "Okay." And I started back to saying "Lord, have mercy." Every time I'd say something he'd say, "Shut, up, Bitch!" I said, "Okay, okay."
He pulled his shoes off. He didn't bend. He slipped his shoes off like that. He says, "Okay, I'm pulling off my shirt." By this time the light across the gas company along with the light in my bathroom, I'm focusing on his hand. He kept this fist balled up, and he was undoing his shirt. First he threw his cap off, over by a recliner chair. He says, "Okay, I'm taking off my shirt now." He said, "And you better not move." And I'm focusing on his fist to see he's holding something in his hand. He took his shirt off and threw it on the floor. He told me step by step what he was taking off. "I'm taking off my pants." He slipped out of his pants, and he crawled up into bed. And I had my legs together like this, and he shoved my legs open and pulled my gown up, and I had on underwear. He felt me down there and he felt the underwear. He said, "Bitch, take these panties off." I took them off and threw them on the side of the bed. Then he rubbed his hands down between my legs. And I said, "Oh, my God." He said, "What did you say?" He said, "Wait a minute. First, Bitch, you're gonna suck my dick." And I thought, "Oh, my God!" He said  I said, "Okay, okay, come on." He crawled up to the top of the bed, and he sat in a sitting position. I have a tall headboard on my bed, and he sat in a sitting position; and I scooted down in bed and put one foot, braced one of my *644 feet on the floor, my right foot. And I said, "Where is it? Where is it?"
And I got it, I grabbed it by my right hand; and when I grabbed it I gave it a yank. And when I yanked it, I twisted all at the same time.
... .
[Again,] I grabbed his penis with my right hand, and I twisted and pulled it all at the same time. And he hit me with his right hand a hard blow beside the head, and when he hit me I grabbed ahold to his scrotum with my left hand and I was twisting it the opposite way. He started to yell and we fell to the floor, and he hit me a couple more licks; but they were light licks. He was weakening some then. Then he leaned over across me and bit me on my right shoulder. While he was biting me I was still hanging onto him, and then I got his neck with my mouth and started biting it. Then I thought, "Well, he might have Aids," [sic] and I let go of his neck, still holding onto him. And he was tussling and trying to hit me and trying to get out of the way, and I don't know how we managed to get out of the bedroom into the hallway. He was trying to get out, and I'm hanging onto him; and he was throwing me from one side of the hall wall to the other.
... .
... I was afraid if I let him go he was going to kill me.
... .
[H]e was a young man, I could see he was a young man, and I've never gone through anything like this before. I didn't have anything to defend myself with.
... .
So I was determined I was not going to turn it aloose. So we were going down the hallway, falling from one side to the other, and we got into the living room and we both fell. He brought me down right in front of the couch, and he leaned back against the couch like this, pleading with me. Well, at that point the night light from the bathroom was shining right across his forehead, and I'm still hollering at him; and I start using some curse words to him. I said, "Goddamn it "
... .
He was pleading. He says, "You've got me. You've got me. Please, you've got me." I said, "I know Goddman well I've got you." He said, "Please, please, you're killing me; you're killing me." I said, "Well, die, son-of-a-bitch." I said, "Die, then." I said, "Son-of-a-bitch, you just won't die for me, will you?" And I couldn't get him to die. He said, "I can't do nothing; I can't do nothing. Call the police; call the police." I said, "Do you think I'm stupid enough to turn you aloose and call the police?" He said, "Well, what am I gonna do?" I said, "You're gonna get the Goddamn hell out of my house." He said, "Well, how can I get out of your house and you won't let me go?" He said, "How can I get out? I can't get out." I said, "Break out, son-of-a-bitch; you broke in, didn't you?" And I was still holding him.
He said, "I can't do nothing." He said, "Oh, you've got me suffering. Lady, you've got me suffering." He said, "Woman, you've got me suffering." I said, "Have you thought about how you were going to have me suffering?" He said, "Well, I can't do nothing now." I said, "Well, that's fine." I said, "And we'll stay right here until my brother comes. He'll be here at five o'clock anyway."
So I said, "I've got two locks on my door, a deadbolt lock and a night lock." And I said, "Damn it, you're gonna undo both of them." So we go to the door. We fumble to the door. He gets up to the lock and he's in so much pain he'd come back down to the floor and I'd make him get back up to the locks. So he managed to get one aloose and he pulled it. He said, "I'm out." I said, "No, there's another one." He undid that one. He still thought he was out. I said, "The screen door is locked." And he undid the screen door. He said, "I'm out! I'm out!" I said, "No, damn it, come on. You're going to the end of the porch." I said, "I'm taking your ass to *645 the end of the porch." I said, "And when I turn you aloose, I'm going to go get my gun and I'm going to blow your mother-fucking brains out." I said, "You nasty, stinking, lowdown, dirty piece of shit, you!" And when I did that I gave it a twist, and I turned him aloose. And he made a couple of steps and then he fell off of the steps and he jumped up and took his right hand and grabbed down here his private area, and made a couple of jumps across the back of my aunt's car. And I ran into my aunt's room, got her pistol from underneath the nightstand, ran back to the screen door, and I fired two shots down the hill the way I saw him go. And then I ran back into the house and dialed 911 and called my brother, and he came over.
Record Vol. II, at 89-94.
The victim also called the Hinds County Sheriff's Department; Deputy Dennis Moulder responded to her call. Moulder recovered Coverson's clothing which Coverson had left behind in the victim's bedroom. Deputy Moulder found the words, "Dwight Coverson," written on the inside of the pants' front pocket. At approximately 4:15 a.m., Moulder drove to Coverson's home  located near the victim's home  and arrested him and transported him to the Hinds County Jail.
Moulder advised Coverson of his rights, but he did not interview him until about six hours later  around 11:00 a.m. At that time, Moulder again advised Coverson of his rights. Coverson responded that he understood his rights and wanted to talk. He confessed that he broke into the victim's home  thinking no one was home  to commit a burglary. He also admitted to being under the influence of drugs and alcohol at the time of the incident.
A Hinds County Grand Jury indicted Coverson for burglary and attempted sexual assault. The trial resulted in a guilty verdict against Coverson.[2] Coverson received a five-year sentence for the burglary and a 20-year sentence for the attempted sexual-assault, the sentences to run consecutively.
Coverson appealed and presented several issues for this Court's analysis.

II. ANALYSIS

A. Issue # 1: Whether the State Erroneously Struck Three Prospective Jurors

1. Coverson's Contention
During voir dire, the State challenged for cause eight prospective jurors; the judge allowed six of these challenges. Coverson questioned the validity of three of these six challenges.
The first challenge involved prospective juror, Ruby Frazier. Frazier informed the judge and attorneys that she had known Coverson, his mother, and brothers "on a friendly basis" for as long as "fifteen years." She later conceded that she considers Coverson to be her "friend." The judge allowed the State's challenge and excused Frazier. The judge briefly explained the basis of his decision: "[J]ust knowing the defendant's mother would surely not be a significant basis to excuse a juror. But there is certainly much additional evidence to indicate to the Court that this juror should be excused for cause."
The second prospective juror excused for cause  C.W. Thompson  also admitted that he had known Coverson and his family. In fact, Thompson noted that he had known Coverson all his life and that he had lived only four or five houses away from Coverson's.
The third prospective juror excused for cause  Chester Moore  admitted that he had known Coverson and his family all his life. He added that he had known Coverson's (deceased) father for over 35 years and that he had worked with Coverson's uncle on a daily basis for years.
Coverson contends that, the foregoing notwithstanding, the judge should not have allowed the State's challenges since the prospective jurors stated that they could be fair and impartial.

*646 2. Application of Relevant Law
Coverson's contention is rejected on both substantive and procedural grounds.
On substantive grounds, statutory and case law empowered the judge with broad discretion to determine whether a prospective juror can be impartial  notwithstanding the juror's admission under oath that he or she can be impartial. See Burt v. State, 493 So.2d 1325, 1327 (Miss. 1986) ("It is well founded that the trial judge has the discretion to excuse potential jurors for cause if the court believes the juror could not try the case impartially.") (citing cases); Miss. Code Ann. § 13-5-79 (1972).
On procedural grounds, once the judge exercised his discretion and determined that the jurors probably could not be impartial, then the determination may not be assigned on appeal as an error:
Any person ... who will make oath that he [or she] is impartial ... shall be competent as a juror in any criminal case... . Any juror shall be excluded however, if the court be of opinion that he [or she] cannot try the case impartially, and the exclusion shall not be assignable for error.

Miss. Code Ann. § 13-5-79 (1972).
In short, the important and long-established maxim has been: (1) that a defendant has no right to have specific prospective jurors try his or her case, and (2) that the defendant cannot complain on appeal of a particular exclusion if the end result was a jury composed of fair and impartial jurors. See Sherman v. State, 108 So.2d 205, 207 (Miss. 1959); Sullivan v. State, 155 Miss. 629, 125 So. 115, 117 (1929). Coverson does not complain that the jury which tried his case was not fair and impartial. He only complains that the judge should not have excused for cause his three life-long friends  Frazier, Thompson, and Moore. Applying the law to the evidence, this Court concludes that Coverson has failed to prove that the judge abused his discretion. The judge obviously felt that the three prospective jurors could encounter difficulty with a decision to send their friend to prison for 25 years. Surely, one cannot find fault with the judge for making such a reasonable and cautious determination.
In sum, this Court affirms on this issue on procedural grounds (i.e., statutory law barred Coverson from raising this issue on appeal) and on substantive grounds (i.e., Coverson failed to prove that the judge's decision constituted an abuse of discretion).

B. Issue # 2: Whether Coverson's Incriminating Statements Should Have Been Suppressed

1. Coverson's Contention
As noted in Section I of this opinion, Deputy Moulder twice read Coverson his Miranda rights  after which Coverson made incriminating statements which amounted to a confession. Prior to trial, Coverson filed a motion to suppress any testimony regarding those statements. The judge held a suppression hearing. During the hearing, Coverson did not deny that Moulder had read him his rights, and he did not deny that he had made the incriminating statements. Coverson contended that he could not recall whether Moulder advised him of his rights, and he could not recall waiving them. He blamed his poor recollection on his use of drugs and alcohol on the night of the sexual assault. Thus, he concluded, he could not have waived his Miranda rights intelligently, knowingly, and voluntarily; and his incriminating statements should be suppressed. The judge did not agree and denied his motion. In this appeal, Coverson contends that the judge erred.

2. Relevant Law
The constitutional principles governing custodial interrogation are well-established  albeit they often evade one's comprehension. One principle dictates that custodial interrogation must be preceded by advice to the putative defendant regarding the Fifth Amendment rights to remain silent and to have an attorney present. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694, 726 (1966). If the right to remain silent is invoked, "the interrogation must cease." If the *647 right to have an attorney present is invoked, "the interrogation must cease until [one] is present." Id., quoted in Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1880, 68 L.Ed.2d 378, 386 (1981); see also Smith v. Illinois, 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488, 493-94 (1984) (per curiam) (This is a "rigid prophylactic rule."). Under either circumstance, interrogation may commence or resume in the absence of an attorney if the putative defendant: (1) "initiated further discussions with the police"; and (2) "knowingly and intelligently [and voluntarily] waived the right ... invoked." Smith, 469 U.S. at 95, 105 S.Ct. at 492, 83 L.Ed.2d at 494; United States v. Gotay, 844 F.2d 971, 976 (2d Cir.1988).
"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the [State]" to prove beyond a reasonable doubt the validity of a defendant's waiver of his "privilege against self-incrimination and his right to retained or appointed counsel." North Carolina v. Butler, 441 U.S. 369, 372-73, 99 S.Ct. 1755, 1757, 60 L.E.2d 286, 291-92 (1979) (quoting Miranda, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 706).
Specifically, Miranda requires proof that "the waiver [was] made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707, quoted in Nash v. Estelle, 597 F.2d 513, 518 (5th Cir.1979); see Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 ("[W]aivers of counsel must not only be voluntary, but also must constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege."); Gotay, 844 F.2d at 976 (same) (citing Smith, 469 U.S. at 95, 105 S.Ct. at 492-93, 83 L.Ed.2d at 1494); Terry v. LeFevre, 862 F.2d 409, 412 (2nd Cir.1988) (same); Grooms v. Keeney, 826 F.2d 883, 887 (9th Cir.1987) (same); Neal v. State, 451 So.2d 743, 753 (Miss. 1984) (same); Abston v. State, 361 So.2d 1384, 1391 (Miss. 1978) (same).
In short, "[a] waiver is voluntary if it is `the product of a free and deliberate choice rather than intimidation, coercion or deception.'" Moreover, "[a] waiver is knowing and intelligent if it is `made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" Grooms, 826 F.2d at 887 (quoting and citing cases) (emphasis added).
In the case sub judice, the trial judge concluded that the State met its burden. Whether this conclusion is correct is a mixed issue of law and fact. Norman v. Ducharme, 871 F.2d 1483, 1486 (9th Cir.1989); Terrovona v. Kincheloe, 852 F.2d 424, 428 (9th Cir.1988). This Court must first conduct an independent review of the totality of the circumstances discoverable in the entire record in order to resolve the questioned validity of a confession or incriminating statements. Accord State v. Whitaker, 578 A.2d 1031, 1039 (Conn. 1990) ("Where the trial court makes specific factual findings regarding [this issue], those findings are entitled to deference so long as they are supported by substantial evidence, but where, as here, the trial court has made no specific findings, we must review the evidence and make our own determination of the circumstances surrounding the defendant's waiver of his constitutional rights."), quoted with approval in Holland v. State, 587 So.2d 848, 860 (Miss. 1991); see Edwards, 451 U.S. at 482, 101 S.Ct. at 1884, 68 L.Ed.2d at 385 (review should focus on the "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused") (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)); Whitaker, 578 A.2d at 1039 (review should focus on defendant's "experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation"). Accordingly, the following is a recitation of relevant evidence.

3. Recitation of Relevant Evidence
During the suppression hearing, Deputy Moulder testified that he twice advised *648 Coverson of his Miranda rights and that Coverson responded that he understood those rights.
In response to leading questions posed by his attorney, Coverson testified that he was under the influence of drugs and alcohol and that he could not "recall" being advised of his rights or having waived them. Coverson conceded that he may have been advised of his rights and that he may have waived them; however, he contended that, in view of his intoxicated state of mind, he could not have knowingly, intelligently, or voluntarily waived his rights.
Under questioning by the State, Coverson made surprising admissions which unequivocally support the judge's conclusion that Coverson knowingly, intelligently, or voluntarily waived his rights. Coverson admitted that, at the time of his arrest, he knew and understood what his rights were. In fact, he knew them so well, that he recited them during the hearing:
State: You knew what your rights were?
Coverson: Yes, I knew what my rights were.

State: You had heard of that before?
Coverson: I had heard of it before.
State: What is your understanding that a criminal person arrested for a crime has the rights to?
Coverson: He has a right to an attorney if he can't afford one.
State: All right. What else?
Coverson: And a right to remain silent.
State: Okay. And what would happen if he couldn't afford an attorney?
Coverson: One would be appointed to him.
State: And what happened if he spoke? What could they do with what he said?
Coverson: It could [be used to] incriminate him.
State: It could be used against him, is that right?
Coverson: It could be used against him.
State: And you understood all of that when you were arrested, is that right? You'd known that for a long time?

Coverson: Yeah.

State: How long have you known that?
... .
Coverson: You can say maybe three, four years... .
Rec. Vol. II, at 150-51. Coverson went on to explain that he had known and understood the Miranda rights by watching crime shows on television, by "read[ing] it in the [news]paper," and by hearing police officers advise others who were being arrested "on the streets." And Coverson's familiarity with Miranda rights is also attributable to his experience as a criminal suspect. That is, Coverson admitted that he has twice been arrested  once as recently as four months prior to his arrest in the case sub judice  and that police officers read him his Miranda rights each time. See Hovland v. Blodgett, 914 F.2d 262 (9th Cir.1990) (defendant's "past experience with the judicial system" factored into the court's decision that he "knew how to request counsel" and "knowingly waived his Miranda rights") (unpublished opinion).

4. Application of Law
The foregoing constitutes strong, if not incontrovertible, evidence of the requisite state of mind  i.e., that Coverson knowingly, intelligently, and voluntarily waived his rights beyond any reasonable doubt. But this does not necessarily constitute the entire picture. In addition to the evidence recited in the preceding section, the following evidence discredits Coverson's tenuous contention that he was too intoxicated to know and understand his rights. Moulder arrested Coverson and advised him of his rights around 4:15 a.m. Over six hours later, around 11:00 a.m., Moulder again advised Coverson of his rights  after which Coverson uttered the incriminating statements. Thus, six hours had passed from the time of his arrest to the time he had uttered the statements. During these six hours, Coverson slept and arguably "sobered up." In other words, he could not have been as intoxicated as he contended during the suppression hearing. Accord United States v. D'Antoni, 856 F.2d 975, 981 (7th Cir.1988) ("The defendant had been drinking and smoking marijuana during the past twenty-four hours... . The defendant himself, however, testified that *649 he had had no alcohol in the five or six hours prior to the interview, and that he understood the detectives' questions.... We agree ... that the defendant's statements to the detectives were made voluntarily.").

5. Disposition
In sum, substantial evidence can be gleaned from the preceding discussion to support the judge's conclusion that Coverson had the requisite state of mind to waive his rights. Accordingly, this Court affirms on this issue. See Schmitt v. State, 560 So.2d 148, 151 (1990).

C. Issues # 3 & # 4: Whether the Judge Erred in Instructing the Jury on Attempted Sexual Battery and in Denying Coverson's Motion for Judgment Notwithstanding the Verdict (j.n.o.v.)?

1. Coverson's Contention
Through these consolidated issues, Coverson contends that the judge erred in granting an instruction on attempted sexual battery and in denying his motion for judgment notwithstanding the verdict "since the evidence adduced at trial failed to prove [that he] made any overt act to attempt to commit sexual battery." More specifically, Coverson contends that the judge erred because the record is devoid of any evidence to prove that he attempted "to penentrate Ms. Lloyd vaginally."

2. Relevant Law
The Hinds County Grand Jury indicted Coverson for attempted sexual battery under Miss. Code Ann. § 97-1-7 (1972) and § 97-3-95 (Supp. 1992). Vol. I, at 1. Section 97-1-7 defines the crime of "attempt." Section 97-3-95 defines the crime of sexual battery: "A person is guilty of sexual battery if he or she engages in penetration with: (a) Another person without his or her consent... ." Finally, Miss.Code § 97-3-97 (Supp. 1992) provides that "penetration" includes "cunnilingus, fellatio [and] any penetration of the genital or anal openings."

3. Application of Law
As noted, Coverson contends that the record is devoid of any evidence of an attempt to penetrate Lloyd vaginally. This is the fatal flaw in Coverson's contention: His mistaken belief that sexual battery involves penetration of only the vagina. Unfortunately for Coverson, § 97-3-97 expressly provides that sexual battery includes fellatio (i.e., oral sex). Attempting to penetrate Lloyd orally is exactly the crime for which the State prosecuted Coverson. Attempting to penetrate Lloyd orally is exactly what Coverson admits to doing: "At this point the defendant [Coverson] ordered Ms. Lloyd to perform oral sex...." See Coverson's Brief at 15. Thus, without question and based on Coverson's own admission, one is left with no other conclusion but that the judge properly instructed the jury on attempted sexual battery and properly denied Coverson's judgment not withstanding the verdict.
In sum, this Court affirms on this consolidated issue.

III. CONCLUSION
Based on the foregoing analysis, this Court affirms the conviction and sentence.
CONVICTIONS OF BURGLARY AND SENTENCE OF FIVE YEARS AND ATTEMPTED SEXUAL-ASSAULT, AND SENTENCE OF TWENTY YEARS, TO RUN CONSECUTIVELY, AFFIRMED.
DAN M. LEE, P.J., SULLIVAN, PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
HAWKINS, C.J., specially concurs with separate written opinion joined by DAN M. LEE, P.J., and SMITH, J.
HAWKINS, Chief Justice, specially concurring:
I concur in affirming, but write because the majority views the State as having an obligation under Amendments V and VI of the U.S. Constitution to prove that Coverson "knowingly and intelligently waived" his rights thereunder as a predicate to admitting his confession into evidence. That *650 is no longer the law; the State has no such evidentiary burden.
Coverson complains of the admission into evidence of the statement he made to law enforcement officers in which he admitted burglarizing the apartment.
There is no question but that the officers scrupulously gave all the Miranda warnings. Objectively, there was nothing more they could have done.
On appeal, however, Coverson maintains he lacked the intelligence to knowingly waive his Fifth and Sixth Amendment constitutional rights, because he was under the influence of drugs and alcohol.
In the 1966 landmark decision, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court mandated specific warnings to an accused  for many years now familiar to every law enforcement officer  of his right to remain silent, that anything he said could be used against him, that he had a right to the presence of an attorney, and an attorney would be appointed for him if he could not afford one. The Court added that after such warnings, "the individual may knowingly and intelligently waive these rights." (Emphasis added) The Court also stated that when an interrogation continued without the presence of an attorney, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (Emphasis added) 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. See also, Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); Moran v. Burdine [sic], 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410, 421 (1986). In Edwards v. Arizona, 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981), the Court held that whether or not the purported waiver was knowingly and intelligently given was to be found "under the totality of the circumstances."
Butler v. State, 608 So.2d 314, 321-22 (Miss. 1992).
In a hearing challenging the competency of a confession, any careful circuit judge can rather easily determine by objective inquiry whether the specific warnings required by Miranda were given. But, suppose the accused is of limited intelligence as so frequently is the case in criminal prosecutions?[1]Miranda has been consistently interpreted by this Court, as well as other state and federal courts, to additionally require a trial court inquiry into the mental capacity of the accused, a far more difficult undertaking. Did he have the mental capacity to knowingly and intelligently waive two very valuable rights guaranteed by the U.S. Constitution  the right not to incriminate himself, and the right to have the presence and advice of a lawyer before he said anything?
Id., at 322 (citations omitted).
Before examining the post-Miranda developments on this question of Constitutional law, it is well first to examine why and when a confession is competent under conventional rules of evidence. The first and core inquiry as to any confession is its trustworthiness as evidence. Without reliability it is useless to the factfinder's search for truth.
Because it is totally foreign to the human personality to admit guilt to something one did not do, and it is also difficult to acknowledge one's own guilt, a person's admission that he committed some criminal offense carries with it a strong element of reliability provided, but only provided, it is freely and voluntarily made. The only assurance a court can have that an admission of guilt has any credence is that it was freely and voluntarily given.
It is also true that, aside from any constitutional guarantee, an extorted confession has always been considered worthless as evidence. This Court has always recognized that a confession resulting from threats, physical force or promise of reward was not free and voluntary, and, therefore, incompetent as *651 evidence. "The vice of induced confessions, whether under pressure of threat or promise, is seen not so much in the method as in the result. It is the improbability of its being true that vitiates it, even though the courts take frequent occasion properly to condemn forcible methods." Usrey v. State, 198 Miss. 17, 22, 20 So.2d 847, 848 (1945). See also Ammons v. State, 80 Miss. 592, 32 So. 9 (1902); Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900). See generally 3 Wigmore Evidence § 822 (Chadbourne Rev. 1970).
Butler v. State, 608 So.2d 314, 323 (Miss. 1992). See generally 23 C.J.S. Criminal Law § 817.
Just as obvious is that in order for a confession to have any evidentiary value, it must have been given by a person with at least enough intelligence to be a competent witness. Ford v. State, 75 Miss. 101, 21 So. 524 (1897); Redwine v. State, 258 Ala. 196, 61 So.2d 724 (1952). See also 23 C.J.S. Criminal Law § 828.
The above requirements are well-settled rules of evidence regarding confessions, aside from any Constitutional guarantee.
Beyond this, however, are two sacred rights guaranteed by the Fifth and Sixth Amendments to the U.S. Constitution, and by Art. 3, § 26 of the Mississippi Constitution,[2] that no accused shall be compelled to be a witness against himself, and has the right to have the assistance of counsel for his defense. It can be readily seen that these Constitutional requirements are prohibitory as well as mandatory. The state has an obligation to refrain from any conduct to extort an accused to incriminate himself, and the state has an affirmative obligation to see that the accused is afforded a lawyer if he wants one.
The purpose of the Miranda holding was to assure compliance by the government with these two constitutional rights, regrettably ignored in too many cases, by requiring at a minimum certain specific warnings to the accused.
It can be readily seen that when a law enforcement officer gives an accused the specific warnings set forth in Miranda, the state has literally complied with the Fifth and Sixth Amendments. It has told the accused he does not have to make any statement, and that any he cares to make can be used against him in court. He has been told that he has the right to a lawyer, and if he cannot afford one, he can have the services of appointed counsel. These amendments go to conduct by the government, something the government can control, and when the state has followed them it has done all it can do.
When an accused is told in clear and simple language that he does not have to make any statement, warned that anything he says can be used against him in court, and further told that he has a right to have his own lawyer, or an appointed lawyer to be present before he makes any statement, it then becomes the choice of the accused whether or not he wants to make any statement.
Miranda has been interpreted to mean, however, that if an accused, after such warning, decides to make a statement, he thereby has "waived" his Fifth and Sixth Amendment rights, and it is incumbent upon the state to show that he "knowingly and intelligently waived" his rights. See, e.g., Neal v. State, 451 So.2d 743, 753 (Miss. 1984). This has required the state to prove as a Constitutional predicate something over which no law enforcement officer has any control, the mental capacity of the accused.
Following Miranda, the question of the mental capacity of an accused to waive his *652 Constitutional rights was raised in a number of cases, culminating in Neal v. State, 451 So.2d 743 (Miss. 1984). See, e.g., Merrill v. State, 482 So.2d 1147 (Miss. 1988); Stevens v. State, 458 So.2d 726 (Miss. 1984); Gator v. State, 402 So.2d 316 (Miss. 1981); Lee v. State, 338 So.2d 399, 401 (Miss. 1976); Hancock v. State, 299 So.2d 188 (Miss. 1974); Harrison v. State, 285 So.2d 889 (Miss. 1973); Dover v. State, 227 So.2d 296 (Miss. 1969); Harvey v. State, 207 So.2d 108 (Miss. 1968).
In Neal we held that the circuit judge did not abuse his discretion in holding Neal had "waived" his Constitutional rights because the record supported Neal had the intelligence to do so. Neal had the distinction of being an alumnus both of Ellisville State School and the Mississippi State Hospital at Whitfield, with an I.Q. of 54. Neal v. State, 451 So.2d 743, 751-57 (Miss. 1984).
The question of the defendant's mental ability to knowingly and intelligently waive his Constitutional rights has been raised in the several cases following Neal, namely: Ricks v. State, 611 So.2d 212 (Miss. 1992); Butler v. State, 608 So.2d 314 (Miss. 1992); Jenkins v. State, 607 So.2d 1171 (Miss. 1992); Bowen v. State, 607 So.2d 1159 (Miss. 1992); Abram v. State, 606 So.2d 1015 (Miss. 1992); Holland v. State, 587 So.2d 848 (Miss. 1991); Kniep v. State, 525 So.2d 385 (Miss. 1988); Johnson v. State, 511 So.2d 1360 (Miss. 1987); Moore v. State, 493 So.2d 1301 (Miss. 1986); Swanier v. State, 473 So.2d 180 (Miss. 1985); Jones v. State, 461 So.2d 686 (Miss. 1984); Stevens v. State, 458 So.2d 726 (Miss. 1984); Billiot v. State, 454 So.2d 445 (Miss. 1984).
With one exception, Dover v. State, 227 So.2d 296 (Miss. 1966), we have held in all cases that defendants, many of whom were mentally deficient in one way or another, nevertheless had the mental capacity to "knowingly and intelligently waive" their Constitutional rights.
Trial and appellate courts' ability to discern mental capacities in uneducated and mentally retarded defendants to understand and intelligently waive Constitutional guarantees has not been restricted to Mississippi. See, Annotation, Mental Subnormality as Affecting Voluntariness or Admissibility of a Confession, 8 A.L.R.4th 16 (1981). See also Cooper v. Griffin, 455 F.2d 1142 (5th Cir.1972); Winfrey v. Wyrick, 836 F.2d 406 (8th Cir.1987), cert. denied sub nom. Winfrey v. Armontrout, 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988); People v. Henderson, 83 Ill. App.3d 854, 39 Ill.Dec. 8, 404 N.E.2d 392 (1980); Commonwealth v. Daniels, 366 Mass. 601, 321 N.E.2d 822 (1975).
The above decisions support the finding of the circuit judge in this case that Coverson did have the intelligence to waive these rights.
More importantly, however, the U.S. Supreme Court in Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), held that [once an accused has been given all warnings as required by Miranda], there is no [exceptional] Constitutional requirement that an accused [have the mental capacity to] "knowingly and intelligently" waive his or her 5th or 6th Amendment rights.
Respondent would now have us require sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, see, e.g. Fed.Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment. "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." Lisenba v. California, 314 U.S. 219, 236, 86 L.Ed. 166, 62 S.Ct. 280 (1941).
We hold that coercive police activity is a necessary predicate to the finding *653 that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause.
... .
We think that the Supreme Court of Colorado erred in importing into this area of constitutional law notions of "free will" that have no place there. There is obviously no reason to require more in the way of a "voluntariness" inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion (citations omitted). Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." Oregon v. Elstad, 470 U.S. 298, 305, 84 L.Ed.2d 222, 105 S.Ct. [1285] 1290 (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. (Emphasis added)

Colorado v. Connelly, 479 U.S. at 166-70, 107 S.Ct. at 521-23, 93 L.Ed.2d at 484-86.
Thus, under Colorado v. Connelly, there is no Constitutional requirement in making a determination whether a confession is free and voluntary to examine the mental capacity of the defendant; the focus is directed entirely to conduct on the part of the state. Also, Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir.1988), cert. denied 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); Winfrey v. Wyrick, 836 F.2d at 411; Penry v. Lynaugh, 832 F.2d 915, 918 (5th Cir.1987), reversed in part on other grounds, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).
Even though there is no Constitutional requirement to do so, as stated earlier, it nevertheless remain true as a matter of evidence that before any confession is admissible, it must be given by a person with enough intelligence to be a competent witness. (Citations omitted)
Butler v. State, 608 So.2d 314, 322-23 (Miss. 1992).
Coverson obviously had the intelligence to understand the statements he made to law enforcement officers.
DAN M. LEE, P.J., and SMITH, J., join this opinion.
NOTES
[1] The facts are recounted in a light most favorable to the verdict.
[2] Coverson did not testify in his defense; he merely rested at the close of the State's case.
[1] Or, as Coverson claims he was, somewhat intoxicated?
[2] Amendment V, U.S. Constitution states in pertinent part:

"No person ... shall be compelled in any Criminal Case to be a witness against himself... ." U.S. Const. amend. V.
Amendment VI, U.S. Constitution states in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence [sic]." U.S. Const. amend. VI.
Art. 3, § 26 of the Mississippi Constitution states in pertinent part: "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both ... and he shall not be compelled to give evidence against himself...." Miss. Const. art. 3, § 26.